

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Norfolk Local Office**
200 Granby Street, Suite 739
Norfolk, VA 23510
(757) 600-4720
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/07/2023

**To:** Dr. Maggie May
219 Leonard Circle
CAMDEN, SC 29020
Charge No: 436-2023-01746

EEOC Representative and email:    RORRIE JEFFERIES
Investigator
Rorrie.Jefferies@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 436-2023-01746.

On behalf of the Commission,

Digitally Signed By:Norberto Rosa-Ramos
12/07/2023

Norberto Rosa-Ramos
Local Office Director

 **South Carolina**
Commission on Higher Education

**Telecommuting Application**
**HR-507B**
**(Est. 7/2021)**
Page **2** of **5**

III.    Is my alternate work location an appropriate environment for telecommuting? (Check those that apply.)

☑    I have a safe, comfortable workspace where it is easy to concentrate on work.

☑    I have internet access with a minimum upload speed of 1.0 megabits per second.

☑    I have household members who will understand I am working and will not disturb my work.

☑    I understand that I am prohibited from providing dependent care (either to a child or an adult) during work hours. I understand that all personal activities, including child and dependent care, pet care, housework, yardwork, personal errands, etc., must be done only during established break times, lunch time or before and after work hours.

☑    I understand and agree that I must use accrued leave when providing dependent care or when addressing other personal responsibilities during work hours. This includes time spent caring for an ill household member or other person.

☑    I have the appropriate level of security required by the agency.

☑    I certify that my home or rental insurance does not prohibit a home office.

☑    I have reviewed the relevant zoning requirements to ensure a home office is permitted.

IV.    The decision to telecommute should be based on the ability of an employee to work in a setting that may be in his or her home or other approved area, without on-site supervision. The following tool can be used by an employee as a basis for discussing the option of telecommuting with a supervisor. The employee should submit the application to a supervisor for evaluation and final approval by the CHE President and Executive Director or designee. The decision whether to approve or deny a Telecommuting Application is at the discretion of the CHE President and Executive Director. **There is no right or entitlement to telecommute regardless of the responses to the application.**

Please answer the following questions rating your abilities, using the following scale:

    5 – Always     4 – Usually     3 – Sometimes     2 – Rarely     1 – Never

1.    I can develop regular routines and am able to set and meet deadlines. I am self-motivated, self-disciplined, and able to work independently; completing projects on time with minimal supervision and feedback; and I am capable of being productive when no one is checking in or watching at work.

    ***Employee Rating:*** 5
    ***Supervisor Rating:*** 5

2.    I have strong organizational and time-management skills; am results-oriented; will remain focused on work while telecommuting and not be interrupted by household distractions; will manage my time and workload well; will find satisfaction in completing tasks on my own; am comfortable setting priorities and deadlines; and can keep my sight on results.

    ***Employee Rating:***    5
    ***Supervisor Rating:***    5

Data Classification: Internal



**South Carolina**
Commission on Higher Education

3. I am comfortable working alone; can adjust to the relative isolation of working away from my official work location; and can set a comfortable and productive pace while working at my alternate work location.

   *Employee Rating:* 5
   *Supervisor Rating:* 5

4. I have a good understanding of the CHE's culture and environment. I am knowledgeable about the CHE's procedures and policies and have been on the job long enough to know how to do my job in accordance with those policies.

   *Employee Rating:* 5
   *Supervisor Rating:* 4

5. I have effective working relationships with co-workers and will be able to maintain such communications while telecommuting.

   *Employee Rating:* 5
   *Supervisor Rating:* 4

6. I am adaptable to changing routines and environments and have demonstrated an ability to be flexible about work.

   *Employee Rating:* 5
   *Supervisor Rating:* 5

7. I am an effective communicator, have demonstrated effective communication between supervisors and co-workers, and am comfortable in using various methods of communication.

   *Employee Rating:* 5
   *Supervisor Rating:* 5

8. I am in good standing with the CHE on my previous and current performance reviews and have no recent disciplinary actions.

   *Employee Rating:* 5
   *Supervisor Rating:* 5

Add up all the responses above.

Employee Total: __40__          Supervisor Total: __38__

Your supervisor total must be 28 points or higher for you to be considered by CHE president and Executive Director for telecommuting.

Data Classification: Internal



**South Carolina**
Commission on Higher Education

**Telecommuting Application**
**HR-507B**
**(Est. 7/2021)**
Page **4** of **5**

V.     How often do you want to telecommute? (Please Check)

- ☐ About once a week
- ☑ Two days a week
- ☑ Three or four days a week
- ☐ Five days a week
- ☐ Occasionally for special projects

VI.     What equipment would you need to telecommute? (Answer yes or no.)

| EQUIPMENT | NEED | CURRENTLY HAVE |
|---|---|---|
| Printer | | |
| Office Furniture | | |
| Other:_____ | | |

If accessing the CHE's network to perform job functions, the employee must use a state-issued laptop. An employee is not authorized to use his or her personal computer.

Employee Signature: _CMJ May_

Date: 27 March 2023

**Supervisor Comments:**

| | Yes | No |
|---|---|---|
| Are the job duties to be performed conducive for telecommuting? | X | ☐ |
| Is the employee's job performance conductive for telecommuting? (Consider the employee's work habits and past job performance.) | X | ☐ |
| Has the employee completed the safety checklist to determine if the employee's designated workspace is appropriate for performing work? | X | ☐ |
| Can a cost savings be realized from this telecommuting arrangement? (e.g. office space reduced) Please specify:    office/desk space available for shared  use | X | ☐ |
| Can arrangements for the necessary office equipment be made without presenting a financial hardship on the agency? | X | ☐ |

Supervisor's Signature:     _Mariam Dittmann_

Date:     04.12.2023

Division Director or Designee's Signature:

Date:

Data Classification: Internal



**South Carolina**
Commission on Higher Education

Telecommuting Safety Checklist
HR-507C
(Est. 7/2021)
Page 1 of 2

**THE LANGUAGE USED IN THIS DOCUMENT DOES NOT CREATE AN EMPLOYMENT CONTRACT BETWEEN THE EMPLOYEE AND THE AGENCY. THIS DOCUMENT DOES NOT CREATE ANY CONTRACTUAL RIGHTS OR ENTITLEMENTS. THE AGENCY RESERVES THE RIGHT TO REVISE THE CONTENT OF THIS DOCUMENT, IN WHOLE OR IN PART. NO PROMISES OR ASSURANCES, WHETHER WRITTEN OR ORAL, WHICH ARE CONTRARY TO OR INCONSISTENT WITH THE TERMS OF THIS PARAGRAPH CREATE ANY CONTRACT OF EMPLOYMENT.**

Success of a telecommuting arrangement depends, in part, on a realistic assessment of the overall safety of an employee's alternate work location. The checklist is necessary to make the employee aware of the need for a safe workspace that is conducive to productive work. The telecommuter should read and complete the checklist regarding the designated alternate work location(s), discuss any concerns, and always report accidents or injuries immediately to his supervisor. If the employee is proposing multiple alternate work locations, this form must be completed for each proposed location. The completed form should be provided to the employee's supervisor.

| | |
|---|---|
| Name: Dr Maggie May | |
| Division and Position: SC CHE AA&L Academic Program Manager | |
| Alternate Work Location Address: 219 Leonard Circle, Camden, SC, 29020 | |

Please read and complete the checklist regarding the designated workspace.

**General Environment**

| | |
|---|---|
| ✓ | The workspace area has adequate lighting and ventilation. |
| ✓ | The workspace is reasonably quiet and free of distractions. |
| ✓ | Aisle, doorways, and corners are free from obstructions to permit movement. |
| ✓ | Internet access is sufficient for telecommuting. |

**Electricity/Equipment**

| | |
|---|---|
| ✓ | There are enough electrical outlets in the designated workspace to support the required equipment. All electrical equipment is free of recognized hazards that would cause physical harm (e.g., frayed wires, bare conductors, loose or exposed wires). If necessary, consult with an electrician or power utility company on capacity questions. |
| ✓ | Necessary electrical outlets are three-pronged (grounded). |
| ✓ | Computer equipment is connected to a surge protector. The equipment is placed at a comfortable height for viewing and will be powered down after the workday is over. |
| ✓ | Computer equipment is on a sturdy, level, well-maintained piece of furniture and the keyboard and mouse are at a height that does not cause wrist strain. |

**Safety and Security**

| | |
|---|---|
| ✓ | There is a fire extinguisher in the designated workspace and a developed fire evacuation plan in the event of an emergency. |
| ✓ | There are working smoke detectors in the designated workspace and other locations within the alternate work location(s). |
| ✓ | Phone lines, electrical cords, and extension wires are secured and out of the way. |
| ✓ | There are security controls in place to protect passwords, agency-owned equipment, and files from unauthorized disclosure. |

I, Dr Maggie May_____, understand it is my responsibility to maintain the safety and appropriate arrangement of my designated workspace. I certify that my responses to the checklist are true and completed to the best of my knowledge. I understand that any erroneous, misleading, or fraudulent information is sufficient grounds for my exclusion from telecommuting. I am aware that it is my responsibility to report accidents or injuries immediately to the CHE President and Executive Director and CHE Human Resources or designee.

_____          March 28 2023
Employee Signature                                     Date

_____          04.12.2023
Supervisor Signature                                   Date

_____          26 April 2023
President and Executive Director                       Date

Data Classification: Internal



**South Carolina**
Commission on Higher Education

**THE LANGUAGE USED IN THIS DOCUMENT DOES NOT CREATE AN EMPLOYMENT CONTRACT BETWEEN THE EMPLOYEE AND THE AGENCY. THIS DOCUMENT DOES NOT CREATE ANY CONTRACTUAL RIGHTS OR ENTITLEMENTS. THE AGENCY RESERVES THE RIGHT TO REVISE THE CONTENT OF THIS DOCUMENT, IN WHOLE OR IN PART. NO PROMISES OR ASSURANCES, WHETHER WRITTEN OR ORAL, WHICH ARE CONTRARY TO OR INCONSISTENT WITH THE TERMS OF THIS PARAGRAPH CREATE ANY CONTRACT OF EMPLOYMENT.**

| NAME | Dr. Maggie May |
|---|---|
| **SUPERVISOR NAME** | Dr. Mariam Dittmann |
| **OFFICE/DIVISION** | CHE AA&L |
| **JOB TITLE** | Academic Program Manager |

I.  Using your current position description and EPMS as guides, list each of the tasks you perform in your job and the percentage of time these duties represent of your total job. Indicate which could be performed at an alternate work location. Mark which of your job duties require access to the CHE's network in order to be performed.

| Job Duties | Percentage of Time | Can be performed at Alternate Work Location? | Network Access required? |
|---|---|---|---|
| Academic Program Manager; Evaluation and Review | 30% | 100% | Yes |
| Research and Policy Analysis | 25% | 100% | Yes |
| Program Productivity Project | 20% | 100% | Yes |
| Proposal to Stakeholders | 10% | 100% | Yes |
| Reach Act Analysis | 5% | 100% | Yes |
| 5% other duties | 5% | 100% | Yes |
| 5% SOP production | 5% | 100% | Yes |
| | | | |

II.  Is my job appropriate for telecommuting? (Check those that apply.)



☑ My job responsibilities are arranged so that there is no difference in the level of service provided to the customer regardless of work location.
☑ My job has minimal requirements for direct supervision or contact with the customer.
☑ My job requires low face-to-face communication, and I have the ability to arrange days when communication can be handled by telephone or email.
☑ My job has minimal requirements for special equipment.
☑ I am able to define tasks and work products with measurable work activities and objectives.
☑ I am able to control and schedule workflow.
☑ My job does not involve Personal Identifiable Information (PII).

Data Classification: Internal

 **South Carolina**
Commission on Higher Education

**Telecommuting Application**
HR-507B
(Est. 7/2021)
Page **2** of 5

III.   Is my alternate work location an appropriate environment for telecommuting? (Check those that apply.)

☑ I have a safe, comfortable workspace where it is easy to concentrate on work.
☑ I have internet access with a minimum upload speed of 1.0 megabits per second.
☑ I have household members who will understand I am working and will not disturb my work.
☑ I understand that I am prohibited from providing dependent care (either to a child or an adult) during work hours. I understand that all personal activities, including child and dependent care, pet care, housework, yardwork, personal errands, etc., must be done only during established break times, lunch time or before and after work hours.
☑ I understand and agree that I must use accrued leave when providing dependent care or when addressing other personal responsibilities during work hours. This includes time spent caring for an ill household member or other person.
☑ I have the appropriate level of security required by the agency.
☑ I certify that my home or rental insurance does not prohibit a home office.
☑ I have reviewed the relevant zoning requirements to ensure a home office is permitted.

IV.   The decision to telecommute should be based on the ability of an employee to work in a setting that may be in his or her home or other approved area, without on-site supervision. The following tool can be used by an employee as a basis for discussing the option of telecommuting with a supervisor. The employee should submit the application to a supervisor for evaluation and final approval by the CHE President and Executive Director or designee. The decision whether to approve or deny a Telecommuting Application is at the discretion of the CHE President and Executive Director. **There is no right or entitlement to telecommute regardless of the responses to the application.**

Please answer the following questions rating your abilities, using the following scale:

5 – Always     4 – Usually     3 – Sometimes     2 – Rarely     1 – Never

1.   I can develop regular routines and am able to set and meet deadlines. I am self-motivated, self-disciplined, and able to work independently; completing projects on time with minimal supervision and feedback; and I am capable of being productive when no one is checking in or watching at work.

   ***Employee Rating: 5***
   ***Supervisor Rating:*** 5

2.   I have strong organizational and time-management skills; am results-oriented; will remain focused on work while telecommuting and not be interrupted by household distractions; will manage my time and workload well; will find satisfaction in completing tasks on my own; am comfortable setting priorities and deadlines; and can keep my sight on results.

   ***Employee Rating: 5***
   ***Supervisor Rating:*** 5



**South Carolina**
Commission on Higher Education

**Telecommuting Application**
**HR-507B**
**(Est. 7/2021)**
**Page 3 of 5**

3.  I am comfortable working alone; can adjust to the relative isolation of working away from my official work location; and can set a comfortable and productive pace while working at my alternate work location.

    *Employee Rating: 5*
    *Supervisor Rating:* 5

4.  I have a good understanding of the CHE's culture and environment. I am knowledgeable about the CHE's procedures and policies and have been on the job long enough to know how to do my job in accordance with those policies.

    *Employee Rating: 5*
    *Supervisor Rating:* 5

5.  I have effective working relationships with co-workers and will be able to maintain such communications while telecommuting.

    *Employee Rating: 5*
    *Supervisor Rating:*

6.  I am adaptable to changing routines and environments and have demonstrated an ability to be flexible about work.

    *Employee Rating: 5*
    *Supervisor Rating:* 5

7.  I am an effective communicator, have demonstrated effective communication between supervisors and co-workers, and am comfortable in using various methods of communication.

    *Employee Rating: 5*
    *Supervisor Rating:* 5

8.  I am in good standing with the CHE on my previous and current performance reviews and have no recent disciplinary actions.

    *Employee Rating: 5*
    *Supervisor Rating:* 5

Add up all the responses above.

Employee Total: _____40_____    Supervisor Total: _____40_____

Your supervisor total must be 28 points or higher for you to be considered by CHE president and Executive Director for telecommuting.

Data Classification: Internal



**South Carolina**
Commission on Higher Education

**Telecommuting Application**
**HR-507B**
(Est. 7/2021)
Page 4 of 5

**V.     How often do you want to telecommute?** (Please Check)

- ☑ About once a week
- ☐ Two days a week
- ☐ Three or four days a week
- ☐ Five days a week
- ☐ Occasionally for special projects

**VI.     What equipment would you need to telecommute?** (Answer yes or no.)

| EQUIPMENT | NEED | CURRENTLY HAVE |
|---|---|---|
| Printer | | |
| Office Furniture | | |
| Other:_____ | | |

If accessing the CHE's network to perform job functions, the employee must use a state-issued laptop. An employee is not authorized to use his or her personal computer.

Employee Signature: _____

Date: _____

**Supervisor Comments:**

| | Yes | No |
|---|---|---|
| Are the job duties to be performed conducive for telecommuting? | x | ☐ |
| Is the employee's job performance conductive for telecommuting? (Consider the employee's work habits and past job performance.) | x | ☐ |
| Has the employee completed the safety checklist to determine if the employee's designated workspace is appropriate for performing work? | x | ☐ |
| Can a cost savings be realized from this telecommuting arrangement? (e.g. office space reduced) Please specify:   Reduced need for office space. | x | ☐ |
| Can arrangements for the necessary office equipment be made without presenting a financial hardship on the agency? | x | ☐ |

Supervisor's Signature:     *Mariam Dittmann*

Date:   02.28.2023

Division Director or Designee's Signature:     *Mariam Dittmann*

Date:   02.28.2023

Data Classification: Internal


**South Carolina**
Commission on Higher Education

**Telecommuting Application**
**HR-507B**
**(Est. 7/2021)**
**Page 5 of 5**

Notice: This telecommuting application with the Safety Checklist must be forwarded to CHE Operations Manager and CHE President and Executive Director for consideration. If approved by the CHE President and Executive Director, a Telecommuting Agreement must be signed and processed before the telecommuting arrangement becomes final. The signed Agreement will be filed in the employee's personnel file located in CHE Shared Services Human Resources.

**CHE President and Executive Director**

☒ Approved

☐ Denied

Signature: _____ on behalf of Dr. Monhollon

Date:    3-15-2023

Data Classification: Internal

Affidavit

Kershaw County,
South Carolina
19 September 2023

I, Lauren Decker, serve as the Youth Librarian at Kershaw County Public Library. On April 20, 2023, Dr Maggie May donated 3 copies of her book: *The College Playbook: Student Success Strategies*. Dr May arrived at approximately 2:05pm. She donated 3 copies of the book, answered a few questions, and we took a picture. Dr May did not participate in a book signing or promotional event at the KCPL that day, nor was one ever scheduled.  The meeting lasted approximately 5-8 minutes and then Dr May left the KCPL.

Signed: *Lauren Decker*            Date *Sept. 19, 2023*
　　　　Lauren Decker

Notary Information: *Caitlin Hutchison*      Date 9-19-2023
　　　　　　　　　Name

S.C. Seal



**R. Wes Hayes, Jr.**
*Chairman*

**Rusty L. Monhollon, Ph.D.**
*President & Executive Director*



## South Carolina
### Commission on Higher Education
*Access ¦ Affordability ¦ Excellence*

May 30, 2023

<u>**HAND DELIVERED**</u>

Dr. Maggie May
219 Leonard Circle
Camden, SC 29020

Dear Dr. May:

This letter is to inform you that your probationary employment with the South Carolina Commission on Higher Education will end effective close of business May 30, 2023, due to the unsuccessful completion of your probationary period.

Please return all agency property, such as key fobs, parking cards, laptop, phone, etc. to your supervisor.

As a probationary employee, you do not have grievance rights, as you are not covered by the State Employee Grievance Procedure Act (Act), S.C. Code Ann. § 8-17-310 et seq., or the South Carolina Commission on Higher Education's Grievance Policy and Procedures.

Should you have any questions concerning any benefits to which you may be entitled, please contact Sydney Evans, Benefits Manager, at (803) 737-1979, or via email at <u>Sydney.Evans@admin.sc.gov</u>.

We appreciate your contributions to the agency and wish you well in your future endeavors.

Sincerely,

*[signature]*

Rusty L. Monhollon, Ph.D.
President and Executive Director

  

## May, Maggie

| | |
|---|---|
| **From:** | Dittmann, Mariam |
| **Sent:** | Wednesday, April 26, 2023 11:12 AM |
| **To:** | May, Maggie |
| **Subject:** | FW: Dr May telecommuting update |
| **Attachments:** | HR-507C M May _signed mwd 41223 RLM.pdf; HR-507B MMay_signed mwd41223 RLM.pdf; HR-507A 10April2023CMJM mwd RLM.pdf |

For your records.



**Mariam W. Dittmann, Ph.D.**

Director, Office of Academic Affairs and Licensing

South Carolina Commission on Higher Education

1122 Lady Street, Suite 400

Columbia, South Carolina 29201

**C** 803-856-0475

**From:** Tippens, Georges <GTippens@che.sc.gov>
**Sent:** Wednesday, April 26, 2023 11:10 AM
**To:** Dittmann, Mariam <MDittmann@che.sc.gov>
**Subject:** FW: Dr May telecommuting update

FYI.



**Georges Tippens**

Deputy Director and General Counsel

South Carolina Commission on Higher Education

1122 Lady St, Ste 400

Columbia, SC 29201

**C:** 803-856-0315

**From:** Monhollon, Rusty <RMonhollon@che.sc.gov>
**Sent:** Wednesday, April 26, 2023 10:39 AM
**To:** Tippens, Georges <GTippens@che.sc.gov>
**Subject:** RE: Dr May telecommuting update

See attached.

**From:** Tippens, Georges <GTippens@che.sc.gov>
**Sent:** Wednesday, April 12, 2023 1:07 PM

1

**To:** Monhollon, Rusty <RMonhollon@che.sc.gov>
**Subject:** FW: Dr May telecommuting update

For your approval.



**Georges Tippens**

Deputy Director and General Counsel

South Carolina Commission on Higher Education

1122 Lady St, Ste 400

Columbia, SC 29201

**C:** 803-856-0315

**From:** Dittmann, Mariam <MDittmann@che.sc.gov>
**Sent:** Wednesday, April 12, 2023 9:41 AM
**To:** Tippens, Georges <GTippens@che.sc.gov>
**Subject:** Dr May telecommuting update

Good morning,

Attached are Dr. May's updated (for 3 days) telecommuting agreements for your review/signature and for Dr. M's approval.

Thank you,
Mariam



**Mariam W. Dittmann, Ph.D.**

Director, Office of Academic Affairs and Licensing

South Carolina Commission on Higher Education

1122 Lady Street, Suite 400

Columbia, South Carolina 29201

**C** 803-856-0475

**May, Maggie**

| | |
|---|---|
| **Subject:** | Notifications Review meeting |
| **Location:** | MWD Office |
| **Start:** | Mon 4/17/2023 11:00 AM |
| **End:** | Mon 4/17/2023 12:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Organizer:** | Dittmann, Mariam |

This meeting is for you and I to discuss the notifications that you reviewed.  My expectation is that you will be able to speak to the details of each notification with a summary of the notification topic.  You should also be prepared to speak to the details of the review that you completed and be prepared to answer questions about the notification and the information submitted. Once we have completed the discussion, I will prepare the letters to go out to the institutions and will work to complete the Program Inventory Update spreadsheet to request that the CHE data team enter the updates.

Thank you for your assistance with this process.

**May, Maggie**

| | |
|---|---|
| **From:** | Dittmann, Mariam |
| **Sent:** | Wednesday, April 12, 2023 9:10 AM |
| **To:** | May, Maggie |
| **Subject:** | RE: Notifications Meeting |

Thank you. I am currently considering additional changes. I am not a liberty at this point to discuss these changes. I will share more information with the team when I am able to do so.

MWD



**Mariam W. Dittmann, Ph.D.**
Director, Office of Academic Affairs and Licensing
South Carolina Commission on Higher Education
1122 Lady Street, Suite 400
Columbia, South Carolina 29201
C 803-856-0475

**From:** May, Maggie <MMay@che.sc.gov>
**Sent:** Wednesday, April 12, 2023 9:09 AM
**To:** Dittmann, Mariam <MDittmann@che.sc.gov>
**Subject:** Notifications Meeting

Hello, Dr Dittmann,
I look forward to meeting with you on Monday from 10-11am to discuss the notifications I volunteered to do last week to help out the team. Since you are instituting a new procedure for review of notifications and reporting, should Jessica and Corey be made aware of the expectations and/or invited to the meeting as well?



**Maggie May, Ed.D**
Academic Program Manager, Academic Affairs and Licensing
South Carolina Commission on Higher Education
1122 Lady St, Ste 400
Columbia, SC 29201
| C: 803-856-0345

PCL XL error
        Warning:       IllegalMediaType

| Date | Time | Incident |
|------|------|----------|
| 2/6/2023 -3/7/2023 | Recurring | Placed in cubical in hallway with all monitors facing my direct supervisor's door. Violation of Confidentiality Agreement I had to sign, hostile work environment, Dr D constantly hovers over my shoulder.  I stay placed in this position for the next 5 ½ weeks. |
| 2/24/2023 | 9:12am | Email correspondence with Trena Houp-USCC- regarding MA Dance new program- despite daily communication with Dr Dittmann and 2 meetings with Dr Gheesling, I was still working on the review and feedback from Dr Gheeslings 2nd review. After communicating the information with Mrs Houp, I am made aware Drs Dittmann and Gheesling had a zoom call I was not aware of to discuss this program with Ms Houp. Not only was this action unprofessional, it created duplicated efforts that yielded no meaningful ends. |
| 3/3/2023 | 9:30am | Emailed Dr Dittmann my draft briefing for ACAP meeting on the Productivity Report I was tasked with. |
| 3/3/2023 | 10am | Despite over 40 hours of documented work, and communication with Dr Dittmann outlining in my EMPS that the Productivity Report would be 20% of my evaluation, Dr Gheesling sent me a required meeting request to be brought up to speed. |
| 3/3/2023 | 10am | Declined the zoom meeting request and responded instead with an update where I politely informed Dr Gheesling that Dr Dittmann designated me on the lead. Emails, and messages via zoom were exchanged. |
|  |  | Dr Dittmann responded that we can discuss in our one-on-one meeting on Tuesday. |
|  |  | After communication with Dr Gheesling, I emailed Dr Dittmann for a meeting Monday at her earliest convenience to discuss the change of command, productivity specific assignment and tasking and my future at CHE. |
|  |  | Corey declines the zoom meetings he sent and texts me he hopes we can collaborate more in the future. |
|  |  | Dr Dittmann sets the meeting for the exact time Dr Gheesling set for me for Monday at 10am. Then sends me a second email expressing support for my performance at CHE and hope we can work together for a long time. |
| 3/6/2023 | 10 | The meeting with Dr Dittmann reiterated that I do not report to Dr Gheesling but I report to her. If I want to take the lead on the productivity I can, but she would like me to include Dr Gheesling in some way. |
|  | 1:30pm | I meet with Dr Gheelsing in my cubical and show him the efforts made on the report. He suggest we work together on the current policy, but I take the lead on the advancement of productivity policy and create a task force. |
|  | 1:30 | Dr Dittmann makes a comment about my mask, my kids have been sick with strep and I've worn it to be respectful in the workplace. |
| 3/7/2023 | 11:30am | After communication with Dr Gheesling, I emailed Dr Dittmann for a meeting Monday at her earliest convenience to discuss the change of command, productivity specific assignment and tasking and my future at CHE. |
| 3/8/2023 | 1pm | During my one-on-one meeting Dr Dittmann did not provide any feedback to my productivity report or the manual data entry I did last week while working in the hallway, with my monitors facing her desk. She repeatedly would hover over my shoulder but now insists I include Corey in the report. She says she |

1

| | | |
|---|---|---|
| | | won't have it on the ACAP agenda. She then says what's with my mask. I remind her my son was very sick over the weekend and I'm just trying to be respectful of workplace so not to get others sick as I was in the hallways for weeks and now in a shared office space. She then says she is not going to allow me to telework on Friday that there is pushback from the President. I asked her what's changed and why are some members of her team allowed to but my contract states it and I am on a Wednesday afternoon just finding this out. She says its the President's call. I asked her when will have a definitive answer. She doesn't know. I ask that she make this a priority and to include me in the meeting. |
| | 1:45 | I walk outside after the meeting and text Corey about his telework schedule and inform him I am setting a meeting with my attorney to discuss the discrimination here. |
| | 1:55 | Dr Dittmann asks to see me in the hallway and says she spoke with Rusty and that I can work from home on Friday. |
| | 2pm | Dr D suggests in team meeting my productivity report be placed back on the agenda. |
| | 6pm | Dr D emails me optional/flex employment hours. I acknowledge the email and ask that she respond in writing that I can telework as per my contract. No response. |
| 9-Mar | 2:20pm | Dr D walks into my office and confirms the productivity report is on the agenda. She asks to meet via zoom, on Friday from 2-3pm to go over my productivity report presentation and sends me a zoom link invitation minutes later. |
| | 2:28pm | I sent Dr D an email to confirm and please respond to the email from the night before confirming the verbal confirmation of telework per my contract. I attach to the email my powerpoint presentation and confirmation of the meeting from 2-3pm the next day. |
| | 2:47 | Dr D walks into my office and verbally confirms I can work from home on Friday. I ask her again to please confirm in writing given the outcomes for the week for my protection. She says ok. |
| 10-Mar | 2pm | Meeting on productivity lasts 3 minutes. She makes several comments about my hair. It was pulled back in a pony tail. I thought that was odd. |
| 15-Mar | 9am | Inquired on telework forms processing for March which were sent in on 28 Feb. Received 2 emails from Dr. D. Then signed forms by George Tippens (same day signature). |
| | 9:15am | Asked if they can confirm they have received April's telework forms. Dr Dittmann came to my office and said they will be processed at the end of the month, which is obviously not how it's done given the timestamp for March start of telework per contract was the day I asked for it. Again, shaping the environment. |
| 13-14 March | | My kids were out of school, but couldn't work remote. |
| 17-Mar | 8:38am | Informed Corey's kids start Spring Break today and he will be working remote all next week. |
| 20-Mar | | Corey took off Monday-his kids on Spring Break |
| 21-Mar | | Corey works remote-kids on Spring Break remainder of week except on Thursday's ACAP Meeting |

2

| 22-Mar | 4:30pm | Phone call after hours to connect with Mr Richard Davis, who was on my hiring committee. He has since left CHE, but I thought he can provide insight to culture and tips for success. |
|--------|--------|------|
| 23-Mar | 8:30am | Meet with Corey in my office to discuss productivity report |
| 23-Mar | ACAP | ACAP Meeting: 8 new programs appeared on the agenda where I was lead reviewer and passed, 13 modifications to program where I am lead reviewer appeared on the agenda and passed, 12 new program notifications were I am the lead reviewer. |
| 27-Mar | 9am | Sent HR 507B for remote work 2 days a week in April (T/TH) via adobe |
| 28-Mar | 11:22am | Resent HR 507B remote work 2 days a week in April (T/TH) via adobe |
| 28-Mar | 12-12:30 | Meet with Corey in my office to discuss productiivty report and updated him on progress. His feedback was positive and asked me to think on how I want to send out the information. |
| 28-Mar | 1pm | One on One meeting, I bring a set of adult legos as a way to extend an olive branch to Dr Dittmann since I feel she doesn't like/respect me. She said she only does legos with her husband let's get to the meeting. I put the legos away and handed her my weekly accomplished tasks. We discussed ACAP meeting, executive summary, ect. |
| 28-Mar | 3:30 | Dr Dittmann came in the office and asked me to change the end date to June 30. I sent an email attached with all three documents stating my contract for 2 days remote is continuous, but signed it as she stated "end of fiscal year" reasoning. |
| 29-Mar | 2pm | Dr Dittmann comes to my office, I provide update on the productivity report that I have done. She asks if I've included Corey. Gave me a directive to include Corey as it's a "team", though it's 20% of my personal EMPS. I did include corey in an zoom chat along with Jessica on my status update. |
| 29-Mar | | Sent an email to Linshu Yin to learn more about the culture of CHE as it relates to APM. |
| 30-Mar | 8:35am | Met with Corey on Zoom to update him on productivity report. Sent a follow up email after meeting to ensure I'm clear on the understanding of the tasks now that he's on the team and that I look forward to collaborating. |
| 30-Mar | | Confirmed meting for Friday at 11am to meet with LinShu |
| 30-Mar | 9-930am | Met with Mr George Tippens as a meet and greet, connect and share ideas of pet projects and roles at CHE to better understand the culture. |
| 30-Mar | 10am | Emailed Dr Anderson to ask for cross-training opportunities in "the other side of the house" as it relates to AA&L (Licensing) |
| 30-Mar | 2pm | I emailed Dr D (CC George Tippens) for status update on telework forms I submitted (28 March). |
| 30-Mar | 2:05pm | Dr Dittmann responded with signed telework paperwork but dropped my score on HR 507B from 40/40 to 38/40 siting point 4: understanding of CHE culture as 4/5 as it relates to my work and point 4/5 citing effective work relationship with co-workers with no conference or even meeting to address concerns, she reduces my points by 2 (still high performing category), but the tension continues to build. |
| 5-Apr | 4:58pm | I receive a letter from HR taking out my remote work and extending my probationary period. |

| | | |
|---|---|---|
| 6-Apr | 8am | Respond to HR asking for clarity on the issue and attached the offer I agreed to. |
| | 4:59pm | HR responds to email adding back in remote work citing 2nd error on their part. |
| 7-Apr | 8am | Review letter form HR. Ask them for the extension given in the initial contract of 3 days to review, given the deadline was that very day as stated in the email, but inconsistency from the actual attached letter which cited 3 days. |
| | 8:30am | Email Dr D for meeting to discuss. |
| | 11:30am | Dr Dittmann says she knew about HR reaching out they've been in contact with her. Urges me to sign it that day- even if I have to stay late to sign it at close to 5pm. She urges me to get in touch with HR and then sign the documents. |
| | 12:20 | Dr Dittmann impromptu calls me on zoom to see if I've gotten in touch with HR and to sign the form. |
| 8-Apr | | I ask President Monhollon to intervene. |
| 10-Apr | 9:15am | Met with President Monhollon regarding the leadership style of Dr Dittmann and asked him to please intervene. I expressed the HR issue to extend the probation period is yet only the latest in the tactics of intimidation and bullying she is willing to go to. |
| 11-Apr | Noon | HR responds to email from Monday and says they are reviewing the information and will be in touch after they get clarification. |
| 11-Apr | 1:30pm | Met with Dr Dittmann and was humiliated over notifications. The SOP states this is the lowest level of review, with Dr Berry in the room she wanted me to go one by one to provide a summary of each notification. Time expired and was not finished before our team meeting. |
| 12-Apr | | Come to work in person because I have not received the documentation back with 2 day a week remote work as President Monhollon said. |
| | | Dr Dittmann sends me an email stating the "process" for the 2 day a week remote now going through George and the President. This does not surprise me, again more use of manipulation and bullying. |
| | | Dr Dittmann schedules a meeting with me for Monday to discuss the notifications with added detail. This is a new process apparently. It has not been discussed in the team meeting yesterday or at all.  I ask her, should Jessica and Corey be invited to the meeting. She replies with she's not at liberty to say the details of the changes she is making. |
| | | |
| | 8:30am | I have coffee with Laura to get a better understanding of the culture and history of CHE. |
| Date | Time | Incident |
| 2/6/2023 -3/7/2023 | Recurring | Placed in cubical in hallway with all monitors facing my direct supervisor's door. Violation of Confidentiality Agreement I had to sign, hostile work environment, Dr D constantly hovers over my shoulder. |
| 2/24/2023 | 9:12am | Email correspondence with Trena Houp-USCC- regarding MA Dance new program- despite daily communication with Dr Dittman and 2 meetings with Dr Gheesling, I was still working on the review and feedback from Dr Gheeslings 2nd review. After communicating the information with Mrs Houp, I am made aware Drs Dittmann and Gheesling had a zoom call I was not made aware of to |

| | | |
|---|---|---|
| | | discuss this program with Ms Houp. Not only was this action unprofessional, it created duplicated efforts that yielded no meaningful ends. |
| 3/3/2023 | 9:30am | Emailed Dr Dittmann my draft briefing for ACAP meeting on the Productivity Report I was tasked with. |
| 3/3/2023 | 10am | Despite over 40 hours of documented work, and communication with Dr Dittmann outlining in my EMPS that the Productivity Report would be 20% of my evaluation, Dr Gheesling sent me a required meeting request to be brought up to speed. |
| 3/3/2023 | 10am | Declined the zoom meeting request and responded instead with an update where I politely informed Dr Gheesling that Dr Dittmann designated me on the lead. Emails, and messages via zoom were exchanged. |
| | | Dr Dittmann responded that we can discuss in our one-on-one meeting on Tuesday. |
| | | After communication with Dr Gheesling, I emailed Dr Dittmann for a meeting Monday at her earliest convenience to discuss the change of command, productivity specific assignment and tasking and my future at CHE. |
| | | Corey declines the zoom meetings he sent and texts me he hopes we can collaborate more in the future. |
| | | Dr Dittmann sets the meeting for the exact time Dr Gheesling set for me for Monday at 10am. Then sends me a second email expressing support for my performance at CHE and hope we can work together for a long time. |
| 3/6/2023 | 10 | The meeting with Dr Dittmann reiterated that I do not report to Dr Gheesling but I report to her. If I want to take the lead on productivity I can, but she would like me to include Dr Gheesling in some way. |
| | 1:30pm | I meet with Dr Gheelsing in my cubicle and show him the efforts made on the report. He suggests we work together on the current policy, but I take the lead on the advancement of productivity policy and create a task force. |
| | 1:30 | Dr Dittmann makes a comment about my mask, my kids have been sick with strep and I've worn it to be respectful in the workplace. |
| 3/7/2023 | 11:30am | After communication with Dr Gheesling, I emailed Dr Dittmann for a meeting Monday at her earliest convenience to discuss the change of command, productivity specific assignment and tasking and my future at CHE. |
| 3/8/2023 | 1pm | During my one-on-one meeting Dr Dittmann did not provide any feedback to my productivity report or the manual data entry I did last week while working in the hallway, with my monitors facing her desk. She repeatedly would hover over my shoulder but now insists I include Corey in the report. She says she won't have it on the ACAP agenda. She then says what's with my mask. I remind her that my son was very sick over the weekend and I'm just trying to be respectful of the workplace so as not to get others sick as I was in the hallways for weeks and now in a shared office space. She then says she is not going to allow me to telework on Friday that there is pushback from the President. I asked her what's changed and why are some members of her team allowed to but my contract states it and I am on a Wednesday afternoon just finding this out. She says it's the President's call. I asked her when will have a definite answer. She doesn't know. I ask that she make this a priority and to include me in the meeting. |

5

| | | |
|---|---|---|
| | 1:45 | I walk outside after the meeting and text Corey about his telework schedule and inform him I am setting a meeting with my attorney to discuss the discrimination here. |
| | 1:55 | Dr Dittman asks to see me in the hallway and says she spoke with Rusty and that I can work from home on Friday. |
| | 2pm | Dr D suggests in a team meeting the productivity report be placed back on the agenda. |
| | 6pm | Dr D emails me optional/flex employment hours. I acknowledge the email and ask that she respond in writing that I can telework as per my contract. No response. |
| 9-Mar | 2:20pm | Dr D walks into my office and confirms the productivity report is on the agenda. She asks to meet via zoom, on Friday from 2-3pm to go over my productivity report presentation and sends me a zoom link invitation minutes later. |
| | 2:28pm | I sent Dr D an email to confirm and please respond to the email from the night before confirming the verbal confirmation of telework per my contract. I attach to the email my powerpoint presentation and confirmation of the meeting from 2-3pm the next day. |
| | 2:47 | Dr D walks into my office and verbally confirms I can work from home on Friday. I ask her again to please confirm in writing given the outcomes for the week for my protection. She says ok. |
| 10-Mar | 2pm | Meeting on productivity lasts 3 minutes. She makes several comments about my hair. It was pulled back in a pony tail. I thought that was odd. |
| 15-Mar | 9am | Inquired on telework forms processing for March which were sent in on 28 Feb. Received 2 emails from Dr. D. Then signed forms by George Tippens (same day signature). |
| | 9:15am | Asked if they can confirm they have received April's telework forms. Dr Dittmann came to my office and said they will be processed at the end of the month, which is obviously not how it's done given the timestamp for March start of telework per contract was the day I asked for it. Again, shaping the environment. |
| 13-14 March | | My kids were out of school, but couldn't work remote. |
| 17-Mar | 8:38am | Informed Corey's kids start Spring Break today and he will be working remote all next week. |
| 20-Mar | | Corey took off Monday-his kids on Spring Break |
| 21-Mar | | Corey works remote-kids on Spring Break remainder of week except on Thurday's ACAP Meeting |
| 22-Mar | 4:30pm | Phone call after hours to connect with Mr Richard Davis, who was on my hiring committee. He has since left CHE, but I thought he can provide insight to culture and tips for success. |
| 23-Mar | 8:30am | Meet with Corey in my office to discuss productivity report |
| 23-Mar | ACAP | ACAP Meeting: 8 new programs appeared on the agenda where I was lead reviewer and passed, 13 modifications to program where I am lead reviewer appeared on the agenda and passed, 12 new program notifications were I am the lead reviewer. |
| 27-Mar | 9am | Sent HR 507B for remote work 2 days a week in April (T/TH) via adobe |

| 28-Mar | 11:22am | Resent HR 507B remote work 2 days a week in April (T/TH) via adobe |
|---|---|---|
| 28-Mar | 12-12:30 | Meet with Corey in my office to discuss productivity report and updated him on progress. His feedback was positive and asked me to think on how I want to send out the information. |
| 28-Mar | 1pm | One on One meeting, I bring a set of adult legos as a way to extend an olive branch to Dr Dittmann since I feel she doesn't like/respect me. She said she only does legos with her husband let's get to the meeting. I put the legos away and handed her my weekly accomplished tasks. We discussed ACAP meeting, executive summary, ect. |
| 28-Mar | 3:30 | Dr Dittmann came into the office and asked me to change the end date to June 30. I sent an email attached with all three documents stating my contract for 2 days remote is continuous, but signed it as she stated "end of fiscal year" reasoning. |
| 29-Mar | 2pm | Dr Dittmann comes to my office, I provide an update on the productivity report that I have done. She asks if I've included Corey. Gave me a directive to include Corey as it's a "team", though it's 20% of my personal EMPS. I did include Corey in an zoom chat along with Jessica on my status update. |
| 29-Mar | | Sent an email to Linshu Yin to learn more about the culture of CHE as it relates to APM. |
| 30-Mar | 8:35am | Met with Corey on Zoom to update him on productivity report. Sent a follow up email after meeting to ensure I'm clear on the understanding of the tasks now that he's on the team and that I look forward to collaborating. |
| 30-Mar | | Confirmed meeting for Friday at 11am to meet with LinShu |
| 30-Mar | 9-930am | Met with Mr George Tippens as a meet and greet, connect and share ideas of pet projects, my book that I'm publishing and roles at CHE to better understand the culture. |
| 30-Mar | 10am | Emailed Dr Anderson to ask for cross-training opportunities in "the other side of the house" as it relates to AA&L (Licensing) |
| 30-Mar | 2pm | I emailed Dr D (CC George Tippens) for a status update on telework forms I submitted (28 March). |
| 30-Mar | 2:05pm | Dr Dittmann responded with signed telework paperwork but dropped my score on HR 507B from 40/40 to 38/40 siting point 4: understanding of CHE culture as 4/5 as it relates to my work and point 4/5 citing effective work relationship with co-workers with no conference or even meeting to address concerns, she reduces my points by 2 (still high performing category), but the tension continues to build. |
| 5-Apr | 4:58pm | I received a letter from HR taking out my remote work and extending my probationary period. |
| 6-Apr | 8am | Respond to HR asking for clarity on the issue and attached the offer I agreed to. |
| | 4:59pm | HR responds to email adding back in remote work citing 2nd error on their part. |
| 7-Apr | 8am | Review letter form HR. Ask them for the extension given in the initial contract of 3 days to review, given the deadline was that very day as stated in the email, but inconsistency from the actual attached letter which cited 3 days. |
| | 8:30am | Email Dr D for a meeting to discuss. |

7

| | | |
|---|---|---|
| | 11:30am | Dr Dittmann says she knew about HR reaching out they've been in contact with her. Urges me to sign it that day- even if I have to stay late to sign it at close to 5pm. She urges me to get in touch with HR and then sign the documents. |
| | 12:20 | Dr Dittmann impromptu calls me on zoom to see if I've gotten in touch with HR and to sign the form. She says I should "Hurry and sign the documents today, even if it means I have to stay late, after hours to get it done." |
| 8-Apr | | I ask President Monhollon to intervene. |
| 10-Apr | 9:15am | Met with President Monhollon regarding the leadership style of Dr Dittmann and asked him to please intervene. I expressed concerns of retaliation by implementing the HR issue to extend the probation period is yet only the latest in the tactics of intimidation and bullying she is willing to go to. |
| 11-Apr | Noon | HR responds to email from Monday and says they are reviewing the information and will be in touch after they get clarification. |
| 11-Apr | 1:30pm | Met with Dr Dittmann and was humiliated over notification assignment. The SOP states this is the lowest level of review, Dr Dittmann has stated these are "rubber stamps" we acknowledge them and include in inventory that's the extent. With Dr Berry in the room she wanted me to go one by one to provide a summary of each notification, drilling me on details of 32 notifications in the most specific terms. Time expired and was not finished before our team meeting. |
| 12-Apr | | Come to work in person because I have not received the documentation back with 2 day a week remote work as President Monhollon said. |
| | | Dr Dittmann sends me an email stating the "process" for the 2 day a week remote now goes through George and the President. This does not surprise me, again more use of manipulation and bullying. |
| | | Dr Dittmann schedules a meeting with me for Monday to discuss the notifications with added detail. This is a new process apparently. It has not been discussed in the team meeting yesterday or at all. I ask her, should Jessica and Corey be invited to the meeting. She replies with shes not at liberty to say the details of the changes she is making. |
| | | |
| | 8:30am | I have coffee with Laura to get a better understanding of the culture and history of CHE. |
| 17-Apr | 10:20 | President M walks by every door saying "good morning," looks in my office, doesn't speak and continues to say hello to the colleague in the next office. Intentionally skipping me. |
| 18-Apr | 2pm | Team meeting I bring in mini cakes to share with the office. Dr Dittmann has no plan for Thursday's ACAP meeting on HB 4060, in that meeting 2 days before she asks Jessica to lead it. I ask to work from home Wednesday bc I have a dentist appoint right after work. |
| 19-Apr | 3pm | Jessica realizes she has a scheduled doctors visit she took Thursday off 2 weeks ago and had informed Dr Dittmann. |
| 24-Apr | 7:30am | Dr Dittmann emailed us on red (urgent) at 5 mins to 5pm Friday, when all of us get off at 3:30pm, saying she wants a daily report of our activities not just for when we telework. |

| | 11am | Dr Dittmann comes into my office and around my desk to view what's on my screens and ask what I'm working on. I was trying to locate the contact number for Dr Karin Roof to relay concerns Dr Dittmann had on notifications. |
|---|---|---|
| 25-Apr | 8am | View the email Dr Dittmann sent out at 4:18pm asking me to correct executive summaries that were templated and provided by her. She reviewed one document and said based on this feedback make corrections have them turned back in by noon on Wednesday for her 2nd review, but then she changed the data source, made comments like "is this statement necessary," when I note that the student survey data is attached to the document (it came in after the initial draft of the proposal). Her instructions are unclear, rapidly change, creating discourse among the ranks, and appear to demonstrate force/power that feels like retaliation. She asked for executive drafts to be turned in by April 17, which they were. She supplied new data on 4/24, and "feedback" on one executive briefing was used for all of them, however the feedback was outside the scope of the template she provided us on 3/30. |
| | 1pm | 1-1 meeting with Dr Dittmann, very brief but detailed everything I've worked on. Asked questions regarding the feedback on executive briefs. She instructed me to take out "student survey data" to not draw attention to it. I found out later she was bombarded by Commissioner Hayes because she pushed up Trident Tech's mission statement for full commission review due to DEI statement that was already approved years ago. Dr Berry and I both urged her in a team meeting to let it lie, it's not the scope of our role if it's already approved, it seems petty. Based on confirmation the same language Commissioner Hayes used on her she used on me. |
| | 2pm | Team meeting  I made my concerns regarding Dr Dittmann's directive to add data to the institution's program proposals. I don't think we should be adding data to them after they've had 1st read, 2nd read, her approval, ACAP approval and now moving on to commissioners. She instructed us to do it anyway. |
| 27-Apr | 11:15 | Impromptu meeting on zoom with Corey and Jessica. Corey lashed out aggressively at Jessica saying she's interrupting him and he will finish his thoughts. Completely unprovoked, uncalled for and not professional. I don't think Jessica should meet alone with him. Though it was uncomfortable for me, I'm glad I was there- unintendedly I bared witness to his treatment not just to me but now to Jessica. After corey attempts to group call us back, he insinuates we all can't get along. I respond via zoom and express to him that I request the professional courtesy of a the weekend to review the feedback from the provosts, I didn't even know was completed and in the meantime perhaps he apologize to Jessica. Corey gets on a zoom call with Dr Dittmann.<br><br>Jessica is on the phone with me when Dr Dittmann walks into her office and asks to speak with her. When Jessica calls me back she says, "Can you believe she asked me if I'm ok and if I need to take the rest of the day and go home?" She says "I told her no. I will not leave my job because this man thinks he can yell at me." |
| 5-May | | After 3 weeks of Dr Berry and I asking Dr Dittmann for assignments for new program proposals she sends them out, but it appears at random, not assigned by institution, and with a very tight turn around. When asked about inventory |

| | | |
|---|---|---|
| | | assignments to reflect the institution we are assigned, she thanks me for my thoughts. Period. |
| 27-Apr | 3:34pm | Knowing I'm off work, Dr Dittmann sends me a message on Zoom asking how my reading is going. |
| 8-May | 7:35AM | Corey messages on Zoom to the team that Dr Dittmann is out sick today. Not sure how he knows this. |
| 8-May | 3pm | Dr Dittmann was out sick, yet was able to meet with Corey at 3pm on zoom. |
| 8-May | | Submit sick leave request for drs appt for Friday. |
| 9-May | 3:30pm | Dr Dittmann says to Jessica and I you can take your computers home and work from there if you don't want to take the state holiday. |
| 11-May | 8:30am | I sent a reminder email asking Dr Dittmann to approve the sick leave request. She comes in my office with Jessica there and says "whether I sign it or not, you are good for Friday". Again, another aspect of waiting til I ask several times for a document. |
| 11-May | 9:58am | Completed the CHE climate survey. I attend the CAAL meeting at CHE. Questions arise from Commissioner Seckenger on the need assessment for the UofSC Dance, which is why I had opted to include the student survey data, but Dr Dittmann directed me to remove that "unnecessary language". Dr Berry nudges me when Commissioner Seckinger asks for it, and says well take that as a win and hopefully Dr Dittmann will recognize your value and include your work. |
| 11-May | 11:30 | Had an email from HR regarding a personnel manner, but was in CAAL meeting. |
| | 12:23 | Had another email from HR seeing if I'm available to meet at 12:30pm. |
| | 12:30pm | Met with HR via phone call, asked about Climate at CHE, the situation with Jessica and Corey, my relationship with colleagues, my relationship with Dr Dittmann "how is it working for her", my book signing, which wasn't a signing, my secondary employment, my time I go to lunch, many questions around that day of dropping off the book at the county library. |
| 12-May | sick leave | I take sick leave to go to the drs appt I made 2 weeks ago regarding the stress I'm under at work. My doctor prescribes an anxiety medication to help with work related anxieties I'm having. |
| 16-May | 8:28am | I follow up with HR contacts from our meeting on Thursday, thanking them for the opportunity to share my concerns. I provide bullet points and time frame of the impromptu meeting lasting 1 hour and 39 minutes addressing issues that I would think would have been two separate meetings: Witness to Corey verbally berating Jessica on zoom, and then what appears to be largely focused on me. I received the auto response that Crista is out of the office until May 30. |
| | 11:30am | Dr Dittmann walks into my shared office as I'm trying to complete her required assignments on new program evals and asks if I can have the reach act syllabus completed by Friday. She needs to let the institutions know. It was the addition of another caseload for that week, but she must had forgotten Jessica was assigned it to. I reorganize my priorities and get them done by our team meeting. I ask questions regarding 3 syllabus, Jessica and I turn them in end of meeting. In that meeting, Jessica asks if the second reads on notifications are |

| | | |
|---|---|---|
| | | necessary and part of a new protocol. Dr Dittmann says "yeah, I guess you don't have to do them as a second reader." Jessica then asks if we need to document anything, is there a rubric we need to complete or how best to brief you- she says no rubric, no need to brief. Then looks at me. It appears the standard she forces me into is one thing, and what she expects from Jessica and Corey are another. |
| 16-May | early morning | Ms Andrea comes into my office and walks back her willingness to serve as a witness should I file a complaint against Dr Dittmann, despite the many texts and times Ms Andrea has came into my office to initiate her guidance on this matter or to check on me. |
| 17-May | 9am | Ms Andrea sends me a very long and angry text stating I have privilege and attacking my character. This saddens me and shocks me at first, but then I know Dr Dittmann has gotten to her to and probably threatened her job. |
| | 2:30pm | I meet with Jessica on zoom to discuss our new program proposal review. She appears very stressed and nervous. I hope she is ok and plan to call her later. |
| | 4:30pm | Jessica tells me on a call that Dr Dittmann, Corey and Bunnie are planning something against me. Dr Dittmann has been stalking my facebook, Bunnie my linkedin, and Corey is looking into something else. She said they are bostering about it to the point people in other departments know about whats going and are concerned for me. |

18-May          9am     I email Georges Tippens, General Council and ask if there are any policies that require me to report that I am taking medication recommended by my doctor to help me deal with the anxiety of the workplace given the tactics of Dr Dittmann. It's very stressful having to anticipate her next approach to humiliating me and trying to get me to leave/quit.

19-May Georges responds that there isn't a policy requiring me to reach out to anyone at work related to the medication. He does state that if I feel I need to reach out to HR, here are the contacts. He lists the two ladies on the call and a gentleman.

19-May                         My daughter's Kindergarten graduation ceremony is today, I applied to use my annual leave to attend her ceremony (2hrs in the morning), it wasn't approved until Thursday at 6pm leaving me questioning if I can attend her program. It's constant petty power moves that make it difficult to keep morale.

22-May          I am in the office half a day, I applied to use 3.5 hours of annual leave to attend my sons' end of year ceremony. Dr Dittmann did not approve it until 1:30am Sunday morning. I wasn't' aware until I came into work and logged in that it was approved. I'm glad I get to go to their program, but it's concerning the ways she continues to exert authority because she can.

I send an email to HR asking the same things I asked to Georges regarding state requirements of reporting medication, very much the same nature as the email to Georges. He responds adding clarity to many things, I do not qualify for FLMA given my employment time doesn't exceed a year, but I may qualify for accommodations, at any time to reach out to him if I feel I need accommodation. He also speaks to the issues with my director and confirms that in their notes I spoke at length with HR both as a witness to an investigation and the subject of an investigation and that HR has detailed my concerns.

23-May Jessica is out on leave until 30-May, our team meeting was canceled. I stayed until 3:45pm in the office today to finish up a review and send out an email. Dr Dittmann walks by my office, looks at her

watch. I acknowledge she's there. I say hello, I'm just wrapping a few things up. She walks to the hallway door opens it, walks out, walks back in and back to her office. She was checking in on me as usual.

26-May I have all of my new program, modifications, notifications complete. I complete the academic program inventory for all senior institutions, private institutions and SCTCS and check CIP codes. I email that to Dr Dittmann, but she has left for the day. So now, of the state authority given to CHE which largely is within Academic Affairs, I have been the lead producer in academic program managing, assigned productivity and now the grunt work of inventory, which are the only initiatives CHE has authority to do and I'm doing them all 4 months on the job.

30-May  The 5th week in a row that my 1-1 meeting is canceled. Our team meeting is canceled too. I finish final review of revisions and communicate with 2 institution provosts. I have email correspondence with Inspector General. Things are certainly feeling odd today. I don't want  to bring more attention to myself and give Dr Dittmann even more reason to come after me, so I try to schedule a meeting more discreet after work.

2:05pm Ms Andrea calls my work phone and says "Hey Maggie Dr Dittmann wants you to meet them in the conference room." I gather my things, Jessica says Maggie just take a minute. She prays with me. I go to the restroom and then to the meeting. The two ladies from HR are there and so is Dr Dittmann. Dr Dittmann says she's letting me go. I ask what the reasoning is. She says its because I'm not a good fit. I ask for example so I can understand. She says she doesn't have to provide one, but I took my lunch to donate books to the library. I bring up that she requires me to take a lunch per state policy, is it her business what I do on my lunch break? She says well you didn't come back to work all afternoon. I said I took my lunch from 2-2:30pm, like I have done before and I did return to working for the last hour of the day. She says no and I didn't tell her anything about it. I state, so instead of coming to me over my book donation and asking me to provide support or even a conversation as to what I was working on, you chose to go directly to HR without allowing me the opportunity and courtesy of a conversation. So, its' not performance related, because there's not one negative performance review, or counseling, or reprimand. She says well I don't think you are a good fit. She provides me the option of resigning or termination. I ask if I can have the remaining part of the day to consider. HR Christa, says no they need an immediate response, but I can take time to look over the documents. I read them both twice, and chose termination. Christa says my health insurance will end tonight, I'll get paid this week and on the 16th. Dr Dittmann escorts me to my office, takes my key fob, ID badge, phone, computer, all property of CHE. She says she can walk me down to the parking deck to let me out, I say that's not necessary.

Dr Berry calls me later and says that Dr Dittmann says she had to let me go, is Jessica ok- offers Jessica to take the remainder of the day if she needs it. Dr Dittmann tells Jessica that the HR issue with Corey is resolved, he got a letter of reprimand in his file.

I set a time with the Inspector General for 11:30am the next day.